WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Kevin Fuciarelli, | No. CV-14-01078-PHX-GMS |
| Plaintiff, | **ORDER** |
| v. | |
| Aaron B. Good, et al., | |
| Defendants. | |

Pending before the Court is the Motion for Summary Judgment by Defendants Officer Edward Chrisman, Officer Aaron Good, and the City of Scottsdale ("the City"). (Doc. 69.)   For the following reasons, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

Plaintiff Kevin Fuciarelli, a dermatological surgeon, owns the building in which his medical practice is located.  He rented space to Dr. Irwin Levey.  On March 10, 2013, Fuciarelli's father called Fuciarelli and stated that Levey, who was two months late paying his rent, was vacating the building without notice.  Fuciarelli arrived at the building while Levey was in the process of moving his belongings into a moving truck.  Fuciarelli entered Levey's suite and announced that he was locking him out.  Dr. Levey's wife, Sharon Levey, approached Fuciarelli and told him she was there to help the tenant and needed to go into the suite to get her car keys.  Fuciarelli did not know her, and she did not identify herself.  Fuciarelli turned her away and entered his adjacent office suite

1    to contact a locksmith.

2        Dr. Levey called 9-1-1 to report that he had been evicted and his keys were locked

3    inside the suite.  The Scottsdale Police Department dispatched officers to the call as a

4    disturbance.  Officer Chrisman arrived at the building and spoke to Sharon Levey, who

5    was waiting alone in the parking lot.  Fuciarelli came down from his office, and Officer

6    Chrisman asked him if Sharon Levey could search the suite for her keys.  Fuciarelli

7    declined.  Officer Chrisman then asked permission to search the suite himself, and

8    Fuciarelli initially agreed but then felt uncomfortable and changed his mind.

9        Officer Good arrived, and Officer Chrisman asked Good to remain with Fuciarelli

10   and his father.  Chrisman knew that Fuciarelli could legally enforce a lockout and retain

11   property belonging to a tenant, but he did not know whether Fuciarelli could retain

12   property belonging to a "non-tenant."[1]  Chrisman went to his patrol car to research

13   commercial landlord-tenant laws.  Good ordered Fuciarelli and his father to remain in the

14   area of the building's entrance.  Fuciarelli waited and paced while Good stood within

15   three to nine feet of him.  According to Fuciarelli, he and his father were detained for

16   almost 30 minutes.  Fuciarelli asked why he was being detained and what was taking so

17   long, but he was given no answers.  Fuciarelli asked if he could call a locksmith, but

18   Officer Good told him that if he attempted to go back into his suite, he would be arrested.

19   Plaintiff's and Defendants' accounts of what next transpired differ dramatically.

20       According to Fuciarelli, after 20 minutes of being told he could not leave the

21   entrance area of the building without being told why, he was growing impatient.  At one

22   point, while pacing in the entrance area, he walked down the sidewalk, and Officer Good,

23   "clearly agitated, shouted at Fuciarelli that he must return and stay near him."  (Doc. 111

24   at 6.)  Fuciarelli complied, but a few minutes later, he walked onto the sidewalk again

25   _____

26   [1] Officer Chrisman did not know (and did not attempt to ascertain) that the car was
     registered both to Sharon Levey and to Dr. Irwin Levey, the tenant, and that Irwin had
27   left to retrieve a spare set of keys.  (Doc. 107-1, Ex. U at 74 of 147, PDF 76.)  However,
     Chrisman did know that Sharon was the tenant's wife.  (*Id.*; Doc. 60 at ¶ 10.)  Moreover,
28   dispatch had told Chrisman that Irwin, the tenant, had placed the call complaining that
     Fuciarelli was withholding his keys.  (Doc. 107-1, Ex. U at 90 of 147, PDF 92.)

and asked why Sharon Levey had not been detained.  Good shouted at him that he could not talk to her.  (*Id.*)  Fuciarelli returned to the entrance area and began talking to his father about their ongoing detention, complaining that the detention was unlawful.  (*Id.*)  Suddenly, without warning, Good "approached Fuciarelli from the rear and tackled him," grabbing him around the neck and slamming him to the ground in a "chokehold."  (*Id.*)  Fuciarelli was "caught unaware," as he had not verbally or physically threatened Good and had not been attempting to evade him.  (*Id.* at 7.)  Fuciarelli did not yell or resist.  (*Id.*)  After Good took Fuciarelli to the ground, he hit his radio call button.  Officer Chrisman arrived and helped to handcuff Fuciarelli.[2]  (*Id.*)

According to Defendants, however, Fuciarelli walked toward Officer Chrisman's patrol car to determine what was taking so long.  Officer Good ordered him to return. Fuciarelli "turned and walked quickly toward Officer Good—arms flexed, chest puffed out and head held high like an 'angry soldier'—and while pointing his finger, he yelled if Officer Good would arrest him," to which Officer Good responded "yes."  (Doc. 69 at 4.) Fuciarelli asked why Sharon Levey had not been detained, and Good responded that she had remained calm.  Fuciarelli continued pacing and seemed agitated, and then he again walked away from his "designated area" toward the patrol car, and then turned toward Sharon Levey, "loudly saying" that he was "exasperated" that her husband had left and saying that she was the one who should be detained.  (*Id.* at 5.)  Fuciarelli gestured with his hands while he spoke, "moving them with such force that it appeared to Officer Good that Fuciarelli was 'punching' the air," and Sharon Levey "felt so threatened that she prepared to get inside her car and lock the door if he came at her."  (*Id.*)  Officer Good ordered Fuciarelli not to talk to Sharon Levey, at which point Fuciarelli turned and approached Good "with his arms flexed and his eyes and mouth wide opened," yelling that he had not been told he could not speak to Sharon Levey.  (*Id.*)  Fuciarelli stopped about five feet from Officer Good.  At that point, Good radioed Chrisman for help and

---

[2] According to Fuciarelli, although he was not resisting while Good attempted to handcuff him, Good had difficulty with the handcuffs.  (Doc. 77 at ¶ 162.)

told Fuciarelli to place his hands behind his back, and Fuciarelli refused, stating that Good could not arrest him.  (*Id.*)  Good decided to restrain Fuciarelli "for safety."  (*Id.* at 6.)  Officer Chrisman "ran to [Good's] aid" and discovered Fuciarelli "on the ground in a prone position" and Officer Good "on Fuciarelli's right-hand side, struggling to handcuff him."  (*Id.*)  Chrisman "tucked Fuciarelli's left hand behind his back and held it so Officer Good could finish handcuffing him."  (*Id.*)

Immediately after being tackled, Fuciarelli began to experience severe pain in his back and neck.  Neither Good nor Chrisman called the paramedics.  After Sergeant Brian Reynolds arrived on the scene and observed Fuciarelli, the Scottsdale Fire Department was summoned, and Fuciarelli was transported to Scottsdale Shea Hospital for emergency evaluation.   Doctors there diagnosed Fuciarelli with upper extremity paresthesias related to spinal cord neuropraxia, and Fuciarelli was transported to Barrow Neurological Institute at St. Joseph's Hospital in Phoenix, where he was admitted for several days and treated by a neurosurgeon who specializes in spinal cord injuries.  The doctors at Barrow diagnosed Fuciarelli with gross cervical instability and a neurapraxic injury and recommended surgery to avoid possible paralysis.  Fuciarelli also had shoulder and elbow pain and was diagnosed with a partial thickness rotator cuff tear and ulnar neuritis.  The record includes testimony from a biomechanics expert who opines that Officer Good's conduct caused the gross cervical instability, the immediate pain that Fuciarelli experienced, and his continued symptoms.  (Doc. 77 at ¶ 154.)

## DISCUSSION

Fuciarelli's Complaint lists six counts.  Three counts allege violations of state law (Count I – negligence of Good and Chrisman; Count II – vicarious liability of the City for the officers' negligence; Count III – negligence of the City in failing to "use reasonable care in the hiring, training, and supervision of Good and Chrisman").  The other three counts allege violations of federal law under Section 1983 of Title 42 of the U.S. Code (Count IV – excessive force by Good and Chrisman; Count V – unreasonable seizure by Good and Chrisman; Count VI – failure to train officers by the City).  Defendants have

1    moved for summary judgment on all counts.

2    **I.      Legal Standard**

3            The Court grants summary judgment when the movant "shows that there is no

4    genuine dispute as to any material fact and the movant is entitled to judgment as a matter

5    of law."   Fed. R. Civ. P. 56(a).   In making this determination, the Court views the

6    evidence "in a light most favorable to the non-moving party."   *Warren v. City of*

7    *Carlsbad,* 58 F.3d 439, 441 (9th Cir.1995).   "[A] party seeking summary judgment

8    always bears the initial responsibility of informing the district court of the basis for its

9    motion, and identifying those portions of [the record] which it believes demonstrate the

10   absence of a genuine issue of material fact."   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

11   (1986).   The party opposing summary judgment "may not rest upon the mere allegations

12   or denials of [the party's] pleadings, but . . . must set forth specific facts showing that

13   there is a genuine issue for trial."   Fed. R. Civ. P. 56(e); *see Matsushita Elec. Indus. Co.*

14   *v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Brinson v. Linda Rose Joint*

15   *Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995).   Substantive law determines which facts are

16   material, and "[o]nly disputes over facts that might affect the outcome of the suit under

17   the governing law will properly preclude the entry of summary judgment." *Anderson v.*

18   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   "A fact issue is genuine 'if the evidence is

19   such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v.*

20   *Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (quoting *Anderson*, 477 U.S.

21   at 248).

22   **II.     Analysis**

23           **A.      Count I – Negligence of Officers Good and Chrisman**

24                    **1.      Police Officers May Be Held Liable For Negligence.**

25           Defendants assert that police are immune from negligence claims under Arizona

26   law and can only be held liable for gross negligence.   (Doc. 69 at 19.)   However, Arizona

27   law does not provide immunity to police officers for negligence involving use of force.

28           The Supreme Court of Arizona "abolished the doctrine of sovereign immunity for

tort liability in 1963, concluding that the government and its employees should generally be responsible for injuries they negligently cause." *Glazer v. State*, 237 Ariz. 160, 163, 347 P.3d 1141, 1144 (2015) (citing *Stone v. Ariz. Highway Comm'n*, 93 Ariz. 384, 392, 381 P.2d 107, 112 (1963) ("[T]he rule is liability and immunity is the exception.")). In 1984, the Arizona legislature enacted the Actions Against Public Entities or Public Employees Act (the "Act"), "which specifies circumstances in which governmental entities and public employees are immune from tort liability." *Id.* "The Act leaves intact the common-law rule that the government is liable for its tortious conduct unless immunity applies." *Id.*; *see also City of Tucson v. Fahringer*, 164 Ariz. 599, 600 n.4, 795 P.2d 819, 820 n.4 (1990) ("In the Act's prefatory statement, the legislature reaffirmed the now well settled common law notion that governmental immunity is the exception and liability the rule, when it stated that 'the public policy of this state [is] that public entities are liable for acts and omissions of employees in accordance with the statutes and common law of this state.'" (quoting Ariz. Rev. Stat. ("A.R.S.") § 12-280, Historical Note)).

Pursuant to the Act, "[u]nless a public employee acting within the scope of the public employee's employment intended to cause injury or was grossly negligent, neither a public entity nor a public employee is liable for" any of ten enumerated acts. A.R.S. § 12-820.02(A).[3] Excessive force is not listed, and no other portion of the Act exempts negligent use of force from the common-law rule that the government is liable for tortious conduct. Therefore, police officers in Arizona who use excessive force during an arrest are liable under the ordinary negligence standard. *See Austin v. City of Scottsdale*, 140 Ariz. 579, 581–82, 684 P.2d 151, 153–54 (1984) ("[T]he City of Scottsdale, having

---

[3] The Supreme Court of Arizona held the Act to be constitutional and recognized "the express authority the Arizona Constitution confers upon the legislature to define those instances in which public entities and employees are entitled to immunity." *Clouse ex rel. Clouse v. State*, 199 Ariz. 196, 203–04, 16 P.3d 757, 764–65 (2001) (holding that a "the trial court correctly instructed the jury that it could return a verdict against the public defendants only if the plaintiffs established gross negligence" because "the plaintiffs' allegations that the defendants negligently failed to retain [an arrestee] in custody fall directly within the language of A.R.S. section 12–820.02.A.1.")

opted to provide police protection, had a duty to act as would a reasonably careful and prudent police department in the same circumstances."); *see also Dominguez v. Shaw*, No. CV 10-01173-PHX-FJM, 2011 WL 6297971, at *3 (D. Ariz. Dec. 16, 2011) ("The legislature did not elect to place use of force into the narrow exceptions granting qualified immunity, and it is not our place to override this decision.  Defendants are not entitled to summary judgment on plaintiffs' negligence claims simply because they are police officers." (internal citation omitted)).

Defendants rely on a 2012 decision of this Court for the proposition that "Arizona state courts have established a common-law immunity from mere negligence for police officers 'to assure continued vigorous police work.'"  *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1017 (D. Ariz. 2012) (quoting *Landeros v. City of Tucson,* 171 Ariz. 474, 475, 831 P.2d 850, 851 (App. 1992)).  In *Hulstedt*, the Court relied on a passage from an Arizona appeals court case:

> The public has a vital stake in the active investigation and prosecution of crime.  Police officers and other investigative agents must make quick and important decisions as to the course an investigation shall take.  Their judgment will not always be right; but to assure continued vigorous police work, those charged with that duty should not be liable for mere negligence.

*Landeros*, 171 Ariz. at 475, 831 P.2d at 851 (quoting *Smith v. State,* 324 N.W.2d 299, 301 (Iowa 1982)).  This passage in *Landeros* was *dicta*, for the court determined that no showing of negligence had ever been made in that case:  "Even if we were to hold that Arizona would recognize simple negligence in the investigation of a crime as a tort, . . . [s]ince there was no showing of negligence . . . , a claim of negligence will not lie." *Id.* at 475–76, 831 P.2d at 851–52.  Moreover, *Landeros* is distinguishable, as it bore narrowly on the matter of negligence "in the investigation of a crime," that is, negligence in making "quick and important decisions *as to the course an investigation shall take*." *Id.* (emphasis added).  The degree of force an officer uses while effecting an arrest is not a decision about which course to pursue in investigating and prosecuting a crime.  Finally, binding precedent at the time that *Landeros* was decided suggests that the *dicta* in

*Landeros* did not accurately reflect Arizona law.  *See Ryan v. State*, 134 Ariz. 308, 309, 656 P.2d 597, 598 (1982) (quoting *Ruth v. Rhodes,* 66 Ariz. 129, 133, 185 P.2d 304 (1947) (holding that a police officer was liable for negligent driving while hurrying to a the scene of an accident:  "We think that a sound public policy requires that public officers and employees shall be held accountable for their negligent acts in the performance of their official duties to those who suffer injury by reason of their misconduct.  Public office or employment should not be made a shield to protect careless public officials from the consequences of their misfeasances in the performance of their public duties.")).

To the extent that *Hulstedt* in its brief review of the issue suggests or holds that the statutory immunity applies in excessive force cases, it was in error.  Summary judgment is denied on this ground.

### 2.    The Officers Do Not Enjoy Statutory Immunity.

Defendants further assert that Officers Good and Chrisman are immune because their conduct was "justified."  (Doc. 69 at 19–20.)  Pursuant to A.R.S. § 13-413, "[n]o person in [Arizona] shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter."  An officer's use of force while making an arrest or detention is "justified" if three conditions are met:

1. A reasonable person would believe that such force is immediately necessary to effect the arrest or detention or prevent the escape.

2. Such person makes known the purpose of the arrest or detention or believes that it is otherwise known or cannot reasonably be made known to the person to be arrested or detained.

3. A reasonable person would believe the arrest or detention to be lawful.

A.R.S. § 13-409.

The parties dispute most of the material facts that bear on whether these conditions are met.  Nonetheless, Defendants argue that "[t]he mere fact that Fuciarelli's account of the takedown differs from Officer Good's account is not enough to create a material issue."  (Doc. 69 at 14.)  Defendants cite *Scott v. Harris*, 550 U.S. 372, 380–81 (2007), in

which the U.S. Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

The record in the case at hand does not blatantly contradict either party's account of the facts.   In *Scott*, the nonmoving party's account of the facts was "utterly discredited" by "a videotape capturing the events in question" that "quite clearly contradict[ed] the version of the story told by [the nonmoving party]."   *Id.* at 378–80. Here, although the record contains a brief audio recording, this recording does not clearly establish what transpired.   On the recording, a man (or possibly two men) can be heard saying, "Put your hands behind your back" and then immediately repeating the command. (Doc. 71 at Ex. 16, 1:21–1:25.)   There is no indication of whether the four-second audio clip was recorded before or after the takedown.   The recording does not establish whether Fuciarelli provoked Officer Good, whether Fuciarelli was a threat to Officer Good or others, whether Officer Good approached Fuciarelli unexpectedly and tackled him from behind, whether the takedown was necessary to effect the arrest, whether the reason for the arrest was made known to Fuciarelli, or whether there was probable cause to support the arrest.   Although the command was issued twice, no time elapsed between the first and second iteration of the command, and therefore the recording does not establish whether Fuciarelli was resisting arrest or disobeying orders.

Rather, the record here is comprised largely of the differing accounts of the parties and various witnesses, many of which conflict with one another.   The record as a whole cannot be said to clearly contradict the account of either party.   As such, the Court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion."   *Scott*, 550 U.S. at 378 (internal quotations omitted).   Viewing the facts and drawing reasonable inferences in the light most favorable to Fuciarelli, none of the three conditions necessary for the officers' conduct to be "justified" are met.   *See* A.R.S. § 13-409.   The officers therefore are not immune from

1    civil liability pursuant to A.R.S. § 13-413.

2        **B.      Count II – Vicarious Liability of the City for the Officers' Negligence**

3        Defendants advance only one argument for dismissing the vicarious liability claim

4    against the City:   the officers cannot be liable for negligence, and therefore the City

5    cannot be vicariously liable for the officers' negligence.  (Doc. 69 at 20.)  However, the

6    officers can be liable for negligence, as is discussed above.  As such, summary judgment

7    on Count II is denied.

8        **C.      Count III – Negligence of the City**

9        Fuciarelli alleges that the City of Scottsdale breached its duty of care "by failing to

10   use reasonable care in the hiring, training, and supervision of Defendants Good and/or

11   Chrisman."  (Doc. 1 at ¶ 39.)  To support this claim, Fuciarelli cites the reports of his

12   experts, Rob Robinson (Doc. 81, Ex. D) and Jeffeory Hynes (Doc. 106, Ex. R).  (Doc.

13   111 at 27.)

14       Rob Robinson opined that "the Scottsdale Police Department was negligent and

15   fell below the standard of care for failing to properly train and/or supervise Officer Good

16   and Officer Chrisman."  (Doc. 81, Ex. D at ROBINSON000016.)  Robinson bases this

17   conclusion on the vague criticism that "[a] supervisor was on the scene of this incident"

18   but "[i]t appears as if the supervisor did not take appropriate action to defuse and rectify

19   the matter."  (*Id.*)  Robinson failed to note what action should have been taken and was

20   not taken.  Furthermore, Robinson suggested that "supervisors who do not proactively

21   address performance issues immediately after they occur tacitly condone inappropriate

22   and improper officer behavior."  (*Id.*)  Robinson failed to identify or give a basis for

23   believing that a supervisor was present when events were occurring, in which his

24   intervention would have made a difference.  In other words, Robinson does nothing to

25   explain which supervisor was present and what he or she should have done to

26   "proactively address performance issues" that was not done.  If Robinson was referring to

27   Sgt. Brian Reynolds, who arrived on the scene *after* the events which form the basis for

28   the lawsuit occurred, there are no facts that give rise to a negligent supervision claim.

Finally, Robinson opined that "[w]ith proper supervision" the "entire matter could have been avoided." (*Id.*) It is unclear whether Robinson believes that a supervisor should have been present at the time the detention occurred or that a supervisor somehow could have otherwise ensured that the officers' conduct conformed with Department policies.

Jeffeory Hynes opined that a supervisor should have overruled the arrest so that charges were never brought. (Doc. 106, Ex. R at HYNES000009.) Regardless of whether this is true, it does not bear on the allegation in Count III that the City failed to use reasonable care in "the hiring, training, and supervision of Defendants Good and/or Chrisman." (Doc. 1 at ¶ 39.) Further, Hynes offers no explanation for his conclusion that not just the officers involved in the incident but also the Scottsdale Police Department as a whole were "grossly negligent." (Doc. 106, Ex. R at HYNES000013.)

Robinson's and Hynes's vague and conclusory assertions are insufficient to create a factual issue sufficient to avoid summary judgment. Federal Rule of Civil Procedure 26(2)(B) provides that an expert report "must contain a complete statement of all opinions the witness will express and the basis and reasons for them [and] the facts or data considered by the witness in forming them." According to the Rule's notes, the expert report must be "detailed and complete" to avoid "sketchy and vague" testimony that fails to dispense with the need to depose the expert or even to provide help in preparing for the deposition of the witness. Fed. R. Civ. P. 26. Where an expert report contains only "naked conclusions unsupported by specific facts," the report "has little evidentiary weight and is inadmissible," and therefore it cannot establish a question of fact so as to defeat summary judgment. *Jackson v. United States*, No. C 05-3006MHP, 2007 WL 4532223, at *4–5 (N.D. Cal. Dec. 19, 2007).

Fuciarelli failed to identify in his Response any other evidence supporting his claim that the City was negligent in the hiring, training, and/or supervision of Officers Good and Chrisman. As such, Fuciarelli has not "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Summary judgment is therefore granted to Defendants on Count III.

### D.    Count IV – Excessive Force by Officers Good and Chrisman

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989). "The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right." *Id.* "[C]laims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.* at 395.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *United States v. Place*, 462 U.S. 696, 703 (1983)). This determination involves three steps. *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003). The first step is assessing "the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Id.* The second step is assessing "the importance of the government interests at stake," which involves evaluating "the severity of the crime," the immediate threat posed to "the safety of the officers or others," and the suspect's attempts to resist arrest or to flee. *Id.* The third step is balancing "the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable." *Id.*

This three-step process is a "totality of the circumstances" assessment that "requires careful attention to the facts and circumstances of each particular case." *Graham*, 490 U.S. at 396. The reasonableness determination "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight" and must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly

evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Moreover, the inquiry is entirely objective: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. "[I]n police misconduct cases, summary judgment should only be granted 'sparingly' because such cases often turn on credibility determinations by a jury." *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010).

Regarding the first step of the excessive force analysis, the force used to take Fuciarelli to the ground was a serious intrusion on his Fourth Amendment interests, causing pain and bodily injury.

Regarding the second step, material questions of fact exist, making it impossible for the Court to assess the importance of the government interests at stake. It is not clear that Officer Good had probable cause to arrest Fuciarelli for any crime, so it is particularly difficult to evaluate "the severity of the crime." Moreover, Fuciarelli maintains that he was standing with his back to Officer Good, complaining to his father that the detention was unlawful, when Officer Good suddenly approached him from behind and took him down to the ground without warning. Viewing the evidence in the light most favorable to Fuciarelli, there was *no* immediate threat posed to the safety of the officers or others.

Further, viewing the evidence in the light most favorable to Fuciarelli, Officer Good would not enjoy qualified immunity. "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 134 S. Ct. 3, 4 (2013) (internal quotations omitted). For the law to be "clearly established," there need not be "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011). Courts should not "define clearly established law at a high level of generality" but rather should consider

1   whether a reasonable person would have known the specific conduct at issue violated a

2   right.  *Id.* at 2084.  "Qualified immunity gives government officials breathing room to

3   make reasonable but mistaken judgments about open legal questions," and accordingly "it

4   protects all but the plainly incompetent or those who knowingly violate the law."  *Id.* at

5   2085.  A reasonable officer would have known that during an investigatory stop,

6   approaching an unarmed person from behind and taking him to the ground while he

7   posed no threat and was not attempting to flee violates that person's Fourth Amendment

8   rights.

9   　　　　The Court therefore denies summary judgment on Count IV as it pertains to

10   Officer Good.

11   　　　　Officer Chrisman, on the other hand, responded to an emergency summons from

12   Officer Good and arrived after Good had already forced Fuciarelli to the ground.

13   Although Fuciarelli alleges that Officer Chrisman caused injuries to Fuciarelli's shoulder

14   and elbow by "forcefully pulling and tugging his shoulders and arms" while helping

15   Officer Good to handcuff Fuciarelli, this fails to establish that Chrisman used excessive

16   force given the circumstances as a regular officer would have perceived them.

17   Regardless of whether Fuciarelli had actually posed a threat to Officer Good or was

18   actually resisting arrest, an officer in Officer Chrisman's place could reasonably believe

19   that Officer Good would not have summoned him unless the situation merited urgent

20   assistance.  The force used by Officer Chrisman in pulling on Fuciarelli's arms, even if it

21   was as described by Fuciarelli, cannot be considered objectively unreasonable under the

22   circumstances in which Officer Chrisman reentered the scene.  "Not every push or shove,

23   even if it may later seem unnecessary in the peace of a judge's chambers, violates the

24   Fourth Amendment."  *Graham*, 490 U.S. at 396.  The Court therefore grants summary

25   judgment on Count IV to the extent that it pertains to Officer Chrisman.

26   　　　　**E.**　　　**Count V – Unjustified Seizure by Officers Good and Chrisman**

27   　　　　Fuciarelli alleged in his Complaint that "[a]t the time Defendants held Plaintiff

28   under investigative detention and placed Plaintiff in a chokehold and restrained him,

there did not exist reasonable and objective facts that constituted a violation of the law or constituted reasonable grounds to suspect Plaintiff had committed an unlawful offense." (Doc. 1 at ¶ 48.)

The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Terry v. Ohio*, 392 U.S. 1, 9 (1968) (quoting *Union Pac. R. Co. v. Botsford*, 141 U.S. 250, 251 (1891)). "[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Id.* at 16. "It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment, and it is not to be undertaken lightly." *Id.* at 17.

"[T]he police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure," and "in most instances failure to comply with the warrant requirement can only be excused by exigent circumstances." *Id.* at 20. However, there is "an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure." *Id.* As such, under *Terry*, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30).

### 1.    The Detention

Officer Chrisman detained Fuciarelli for the purpose of researching commercial landlord-tenant laws to determine whether Fuciarelli had the lawful authority to withhold Sharon Levey's property from her. Chrisman reasoned that if Fuciarelli did not have

1    such authority, depriving Ms. Levey of her property might have constituted the crime of

2    theft.  A.R.S. § 13-1802(A)(1).

3           Officer Chrisman was aware that commercial landlords in Arizona could lawfully

4    reenter and take possession of the premises when a tenant is at least five days late on

5    paying rent.  (Doc. 60 at ¶ 34.)  Under Arizona law, "[i]f the tenant refuses or fails to pay

6    rent owing and due, the landlord shall have a lien upon and may seize as much personal

7    property of the tenant located on the premises and not exempted by law as is necessary to

8    secure payment of the rent."  A.R.S. § 33-361.  Sharon Levey told Chrisman that they

9    were in arrears on their rent.  (Doc. 107-1, Ex. U at 72 of 147, PDF 74.)  A reasonable

10   officer would therefore be aware that the tenant, Irwin Levey, who placed the 9-1-1 call

11   explaining that he could not retrieve his keys, was not entitled to do so.

12          Officer Chrisman knew that Sharon Levey was the tenant's wife.  Chrisman has

13   testified, however, that he did not know that the keys in question jointly belonged to the

14   tenant and did not inquire into the matter.  (Doc. 107-1, Ex. U at 74 of 147, PDF 76.)  If

15   Chrisman had seized Fuciarelli under the belief that under Arizona law, Fuciarelli

16   commits a theft by denying a locked-out tenant's wife access to her property, the issue

17   would be whether such an interpretation of Arizona law was objectively reasonable.  *See*

18   *Heien v. N. Carolina*, 135 S. Ct. 530, 536–39 (2014) (holding that a detention can be

19   reasonable despite an officer's mistake of law, provided the mistake is an objectively

20   reasonable interpretation of an ambiguous law).

21          However, Officer Chrisman did not act under such a belief.  Rather, he had *no*

22   *idea* what the law was as it pertains to the property of non-tenants.  Having a mistaken

23   idea about the law is fundamentally different than simply not knowing the law at all.  *Cf.*

24   *Flint v. City of Milwaukee*, 91 F. Supp. 3d 1032, 1058–59 (E.D. Wis. 2015), *appeal*

25   *dismissed* (Jan. 11, 2016), *reconsideration denied in part*, No. 14-CV-333-JPS, 2015 WL

26   1523891 (E.D. Wis. Apr. 2, 2015) ("[T]he officers *did not know the law* and thus could

27   not make a reasonable mistake about it.").  An officer cannot detain someone and then

28   proceed to conduct legal research to try to ascertain if his conduct might be illegal.  If an

officer knows the facts of a case but does not know whether those facts amount to a violation of the law, absent exigent circumstances, the situation is not one that requires "necessarily swift action predicated upon the on-the-spot observations of the officer on the beat." *Terry*, 392 U.S. at 20; *cf. Sythe v. City of Eureka*, 78 F. Supp. 2d 1050, 1053–54 (N.D. Cal. 1999) ("[A] reasonable public official, particularly a police officer, is expected to know the law."). To the extent that an officer needs to research a law to determine whether certain conduct is criminal under the law, a reasonable suspicion of criminality cannot arise until *after* the officer educates himself on the applicable law.

After Officer Good arrived on the scene, Officer Chrisman requested that Officer Good "remain with" Fuciarelli and his father. (Doc. 107-1, Ex. U at 124 of 147, PDF 126.) Defendants concede that both Chrisman and Good detained Fuciarelli. (Doc. 69 at 9; Doc. 107-1, Ex. U at 85, 124, PDF 86, 126.) Neither Chrisman nor Good had a reasonable suspicion to justify the detention.

Nor can the officers claim qualified immunity. A reasonable officer could not believe that it is constitutional to detain a person without any knowledge of existing law that would make that person's conduct illegal and to use the duration of the detention to attempt to locate such a law. It is not enough for Chrisman to claim that he was investigating Fuciarelli for "theft" when Chrisman knew that Fuciarelli had the legal right to deny a rent-delinquent tenant access to his property, and Chrisman knew of no exception that would require Fuciarelli to surrender property to that tenant's wife. Nor is it enough for Good to claim that he was detaining Fuciarelli at Chrisman's request. Together, the two officers lacked the collective knowledge to detain Fuciarelli. *Cf. United States v. Ramirez*, 473 F.3d 1026, 1037 (9th Cir. 2007) ("Where one officer knows facts constituting reasonable suspicion or probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.").

Viewing the facts in the light most favorable to the Defendants, the detention of

1  Fuciarelli was not supported by a reasonable suspicion.

2            **2.**     **The Arrest**

3       Count V of the Complaint also alleges false arrest.  "The standard for arrest is

4  probable cause, defined in terms of facts and circumstances sufficient to warrant a

5  prudent man in believing that the suspect had committed or was committing an offense."

6  *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotations omitted).  "[T]he

7  substance of all the definitions of probable cause is a reasonable ground for belief of

8  guilt, and that the belief of guilt must be particularized with respect to the person to be

9  searched or seized."  *Maryland v. Pringle*, 540 U.S. 366, 371 (2003) (internal quotations

10  omitted).  "To determine whether an officer had probable cause to arrest an individual,

11  we examine the events leading up to the arrest, and then decide whether these historical

12  facts, viewed from the standpoint of an objectively reasonable police officer, amount to

13  probable cause."  *Id.* (internal quotations omitted).

14       The officers did not have probable cause to believe that Fuciarelli committed theft.

15  Viewing the facts in the light most favorable to Fuciarelli, the officers also did not have

16  probable cause of any other crime sufficient to justify Fuciarelli's arrest.  Summary

17  judgment cannot be granted on the matter of qualified immunity because assuming

18  Fuciarelli's version of the facts, there was clearly no probable cause of any crime, so

19  Good violated clearly established constitutional rights by arresting him.  Summary

20  judgment is therefore denied on Count V to the extent that Count V alleges false arrest.

21       **F.**     **Count VI – § 1983 Claim Against the City for Failure to Train Officers**

22       "Plaintiffs who seek to impose liability on local governments under § 1983 must

23  prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v.*

24  *Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs. of City of N.Y.*,

25  436 U.S. 658, 691 (1978)).  "Official municipal policy includes the decisions of a

26  government's lawmakers, the acts of its policymaking officials, and practices so

27  persistent and widespread as to practically have the force of law."  *Id.* at 61.  "In limited

28  circumstances, a local government's decision not to train certain employees about their

legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983," but nonetheless, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."  *Id.*  "[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989).

"Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Connick*, 563 U.S. at 61 (quoting *Bd. of Cty. Comm'rs of Bryan Cty., Oklahoma v. Brown*, 520 U.S. 397, 410 (1997)).  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Id.*  "A less stringent standard of fault for a failure-to-train claim would result in *de facto respondeat superior* liability on municipalities."  *Id.* at 62 (internal quotations omitted).

"A pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train," considering that "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."  *Id.*  However, the U.S. Supreme Court has not "foreclose[d] the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations."  *Id.* at 64.

Here, Fuciarelli failed to provide any evidence of a pattern of similar constitutional violations that would have put the City on notice that some deficiency exists in its officer training program.  Nor has Fuciarelli provided evidence that a training deficiency exists that would cause "unconstitutional consequences" that were "so patently

obvious" as to render "proof of a pre-existing pattern of violations" unnecessary.  *Id.*  In fact, Fuciarelli notes that the City "had specific policies[,] rules[,] and procedures governing commercial tenant disputes" and that such policies and procedures were "set forth in the SPD Field Orders."  (Doc. 111 at 22.)  Nonetheless, Fuciarelli alleges that the City "lacked policies to ensure that officers followed the procedures set forth in the SPD Field Orders."  (*Id.*)  The *existence* of the field orders undercuts this argument.  The generalized allegation that the City should have done more to ensure that officers followed their procedures, without evidence that the City had reason to believe that the officers routinely violated those procedures, does not raise an issue of fact on Fuciarelli's failure to train claim.  He thus fails to demonstrate that any potential deficiency in the officers' training could constitute "deliberate indifference" to citizens' constitutional rights.  *See Connick*, 563 U.S. at 61.

Summary judgment is therefore granted on Count VI.

### G.    Punitive Damages

"[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).  Viewing the facts in the light most favorable to Fuciarelli, a reasonable jury could find that Officer Good's conduct exhibited reckless or callous indifference to Fuciarelli's Fourth Amendment rights.  Summary judgment on the issue of punitive damages is denied.

### CONCLUSION

Officers Good and Chrisman are not immune from liability for negligence under Arizona law, and therefore summary judgment is denied on Count I (negligence of the officers) and Count II (vicarious liability of the City).

Fuciarelli failed to produce evidence supporting his claim that the City was negligent in the hiring, training, and/or supervision of Officers Good and Chrisman, and therefore summary judgment is granted to Defendants on Count III.

1    Genuine disputes of material facts exist regarding whether Officer Good used
2    excessive force in violation of the Fourth Amendment.  However, viewing the facts in the
3    light most favorable to Fuciarelli, Officer Chrisman did not use excessive force.
4    Therefore, summary judgment is denied on Count IV as it pertains to Officer Good and
5    granted as it pertains to Officer Chrisman.

6    Viewing the facts in the light most favorable to Defendants, Officers Chrisman
7    and Good detained Fuciarelli without reasonable suspicion of criminal activity.

8    For the reasons set forth above, summary judgment is denied on Count V to the
9    extent that it pertains to Fuciarelli's arrest.

10   Fuciarelli failed to establish a genuine dispute of material fact as to whether the
11   City failed to train its officers so as to trigger liability under § 1983.  Summary judgment
12   is therefore granted to Defendants on Count VI.

13   A reasonable jury could find that Officer Good's conduct exhibited reckless or
14   callous indifference to Fuciarelli's Fourth Amendment rights, and therefore summary
15   judgment on the issue of punitive damages is denied.

16   **IT IS THEREFORE ORDERED** that the Motion for Summary Judgment by
17   Defendants Chrisman, Good, and the City (Doc. 69) is **GRANTED IN PART AND**
18   **DENIED IN PART**.

19   Dated this 30th day of August, 2016.

20
21
22   Honorable G. Murray Snow
23   United States District Judge
24
25
26
27
28

- 21 -